UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA LEE MENDOZA, | No. 2:20-cv-01638 KJM AC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| MICHAEL PALLARES, Warden, | |
| Respondent. | |

Petitioner is a California state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition, ECF No. 1, challenges petitioner's 2014 conviction for second degree murder. Respondent has answered, ECF No. 11, and petitioner has filed a traverse, ECF No. 14.

BACKGROUND

I. Proceedings in the Trial Court

A. Preliminary Proceedings

Petitioner was charged in San Joaquin County with murder and related charges arising from the 2011 death of her husband, whom she admitted shooting. The case went to trial in 2014.

The prosecutor moved in limine for exclusion of defense expert testimony regarding battered women's syndrome. No expert witnesses or expert reports had been disclosed by the defense. At hearing, defense counsel confirmed that he would not be presenting expert testimony

on battered women's syndrome. The court accordingly granted the motion. 1 RT 29 (ECF No. 10-7 at 43). The following exchange then ensued:

> MR. DERMAN: Then the People would further request that the subject matter be off limits also. If she claims she acted in self-defense, that's one thing. If she claims she suffers from some sort of syndrome, whether the information is elicited from an expert or lay opinion.
>
> MR. CINGCON: I'm not going to offer any expert opinions or any lay opinions from anyone, other than my client, that she suffered from any Battered Women's Syndrome, but I think that there could be corroborating witnesses to the incidents against my client, but no, I'm not presenting anything entitled Battered Women's Syndrome, no. These would be percipient witnesses or -- no Battered Women's Syndrome. Of course, if I had an expert witness, I would have given it to them a long time ago, but I'm not choosing to do that as a matter of trial strategy.

1 RT 29-30 (ECF No. 10-7 at 43-44). The court made no further rulings on the issue. Id.

      B. The Evidence Presented at Trial[1]

          1. Prosecution Case

Petitioner and her husband, Michael Bradford, began dating in 2000 and had an on again, off again relationship for years. The relationship was characterized by frequent arguments that sometimes turned physical. In August 2007, in a confrontation with a Kmart security guard, Bradford sustained a head injury that left him with a steel plate where a portion of his skull had collapsed. Petitioner and her husband split up in 2008, got back together in 2010, and married in January 2011, around the time that Bradford received a $240,000 settlement from the Kmart incident. Petitioner thought he would buy them a place to live, but instead he spent the money on gambling and drugs and loans to friends. Petitioner rented a room in a house rented by her friend Aida. Bradford either stayed with petitioner or at a motel managed by his brother.

In the weeks leading up to March 14, 2011, petitioner repeatedly expressed anger at Bradford's staying out all night gambling and her suspicion that he was cheating on her. She told his brother and her friend that she would kill Bradford if he hurt her feelings.

////

---

[1] The following summary is adapted from the opinion of the California Court of Appeal, ECF No. 10-21 at 2-6.

2

On February 13, 2011, petitioner was upset because she suspected her husband of cheating with his ex-girlfriend Lisa, who was sending text messages. Petitioner found Bradford with his friend Brian in an AutoZone parking lot. She drove her vehicle into her husband's truck, backed up, and struck the truck a second time. She told Bradford, "[G]ive me some money, fucker, so I can buy a gun and shoot your punk ass . . . ."

Petitioner did buy a gun in February 2011. She told a friend she bought it in case she wanted to go duck hunting. Petitioner told others that she would shoot her husband if he ever hurt her or pissed her off. Also in February 2011, petitioner cut the brake line of a Jeep and put an antacid tablet in the gas tank, because she was upset that the woman who owned the Jeep had gone gambling with Bradford.

On March 13, 2011, petitioner was angry at Bradford for not coming home the previous night. She pulled a gun on him outside the home, scaring him. She told police she pointed the gun at his truck and jokingly told him she was going to kill his truck, and he jokingly said, "no, not my truck."

Just after midnight on March 14, 2011, petitioner texted the victim, "Where are you? Call me ASAP." Thirty-eight minutes later, she texted him, "A wise . . . man call wife with big gun and bigger temper. Chief. Call TP. - R Mendoza." Twenty minutes later, she texted him, "Sitting bull soon become raging bull and go find sitting duck. - R Mendoza." Bradford did not respond. At 7:32 a.m., petitioner texted him, "What up u fuckin up again." And "let me no [sic] I not up 4 games call me now b4 hunting season opens – R Mendoza."

Around 4:00 p.m. on March 14, 2011, Bradford went to petitioner's home. They argued. One neighbor (whose preliminary hearing testimony was allowed because he was deceased at the time of trial) heard petitioner alternately laughing and arguing but did not hear a second voice. The neighbor then saw petitioner fire gunshots at Bradford from the porch, as he ran toward his truck. A different neighbor heard gunshots and someone cheering "Woo hoo." That neighbor then looked and saw petitioner fall to her hands and knees and cry "Oh my God, oh my God. I shot him."

Paramedics transported the comatose victim to the hospital. He had sustained a gunshot

wound to the neck that hit the spinal canal, leaving him a quadriplegic. He could not drink, eat, breathe or talk on his own. Bradford died on August 7, 2011, from complications from the gunshot wound to the neck, i.e., hemorrhagic pneumonia resulting in sepsis.

At the shooting scene, petitioner told a fire captain and a police officer that she shot her husband because he had choked her. She had no visible injuries. She complained of shortness of breath, but her breathing was not labored. The victim weighed about 110 pounds and was five feet and nine inches tall, whereas petitioner was 50 pounds heavier but six inches shorter.

The jury heard petitioner's recorded post-arrest statement to police, in which she said she and Bradford had argued that day about money and his going to casinos with other women. He wanted to leave, but she blocked the door. He shoved her face down on the bed. She has COPD and could not breathe. He got up and tried to leave. She grabbed the gun from under the mattress to "scare" him because she was "mad." He ran from the bedroom. She followed and fired the gun in the hallway or front room, but missed. She fired again from the porch as he ran to the driver's door of his truck. She followed and shot him while he was crouched down next to his truck. She saw him bleeding on the ground next to his truck.

    2. <u>Defense Case</u>

Petitioner testified in her own defense. She recounted multiple episodes of her husband slapping, hitting, punching, and pushing her in years past. She also said he verbally and emotionally abused her. She put up with it because she loved him. The most recent physical incidents prior to the day of the shooting were in 2008 when they were split up but still saw each other. They got into a fight in a car, and he hit her and tried to run her over when she jumped out of the car. Later in the year, he shoved her and hit her in the chest outside her mother's retirement home.

Petitioner testified that Bradford told her stories that scared her. For example, he told her that he knew how to dispose of a dead body by feeding it to pigs, and that when he was a child his uncle paid him to chop off puppies' heads with a shovel. She claimed she bought the gun because her husband feared home invasions, and his father told her some girls would be after her for refusing to move her truck. She also claimed that, after she bought her gun in February 2011, her

husband bought a gun to kill the Kmart guard who caused his head injury, even though her husband had not expressed a desire to kill the guard since 2007.

Petitioner denied some events that prosecution witnesses had testified to, like threatening her husband with the gun before the day she shot him.

Petitioner shot her husband because he tried to kill her. She was mad because he told her had been with Lisa all night, and he did not care that Lisa had been sending petitioner harassing text messages. He threw petitioner on the bed, held her down, and tried to suffocate her. She has asthma and COPD and could not breathe. She passed out. When she came to, her husband was not there. She grabbed her gun and went after him. She saw him in the front room and fired her gun because she thought he was going to his truck to get his gun and kill her. She fired her gun at him when he was outside the house to scare him away from his truck. She did not recall shooting from the porch.

Various witnesses, including her first husband, testified to petitioner's peaceful and non-violent nature.

### 3. Closing Arguments and Jury Instructions

The prosecutor urged the jury to disbelieve petitioner's claims that she was afraid of her husband or that he provoked her to shoot him. She stayed with him; she married him; she provoked him. A person who was afraid of her husband would not seek him out at an AutoZone parking lot and ram her vehicle into his truck. She admitted to detectives that if she gets mad and then her husband gets mad, he leaves.

Defense counsel argued to the jury, "This case is about Rebecca Mendoza, an abused person, shooting the abuser in self-defense, in the heat of passion." Counsel argued that petitioner was "an abused person entangled in a toxic, long-term relationship with the abuser." In a closing argument consuming about 100 pages of reporter's transcript, trial counsel reviewed every episode of physical, verbal, and emotional abuse by the victim. Counsel also told the jury that women who are victims of domestic violence sometimes stay in abusive relationships because they still love their abuser. They suffer in silence because their self-esteem has been reduced to nothing.

5

The jury was instructed on justifiable homicide self-defense and voluntary manslaughter imperfect self-defense. The court instructed the jurors that, if they found the victim threatened or harmed defendant in the past or if defendant knew that the victim had threatened others in the past, the jurors may consider that information in deciding whether defendant's conduct and beliefs were reasonable. And someone who has been threatened or harmed in the past is justified in acting more quickly or taking greater self-defense measures against that person. The court also instructed the jury on provocation and heat of passion.

C.  Outcome

On October 9, 2014, the jury found petitioner not guilty of first degree murder but guilty of second degree murder, and found the associated gun enhancement to be true. The jury also found defendant guilty of two counts of vandalism (Counts Two and Four) and exhibiting a firearm (Count Five), but not guilty of assault with a car (Count Three).

Petitioner was sentenced on March 16, 2015, to an aggregate state prison term of 40 years to life, comprised of a term of 15-years-to-life on the second degree murder count and a 25-year-to-life enhancement on the firearm use enhancement. She received a sentence of time served on Counts Two, Four and Five.

II.  Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on December 3, 2018. ECF No. 10-21. The California Supreme Court denied review on February 27, 2019. ECF No. 10-22.

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on August 12, 2020. ECF No. 10-23. The instant federal petition was timely filed thereafter.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits

6

in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court

reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

## DISCUSSION

I. Ineffective Assistance of Trial Counsel in Failing to Investigate and Present Expert Witness Testimony on Intimate Partner Battering

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that her lawyer violated her Sixth Amendment right to the effective assistance of counsel by failing to obtain expert witness services on the issue of Intimate Partner Battering ("IPB") (previously known as Battered Women's Syndrome) and present a defense based on California Evidence Code section 1107.[2] The only exhibit in support of the petition is a declaration from post-conviction counsel outlining her efforts to communicate with trial counsel, and his statement that he never spoke to an IPB expert in relation to petitioner's case. ECF No. 1-2 at 2. Trial counsel also told post-conviction counsel that he rejected an IPB defense for unexplained "tactical reasons;" his files did not contain any notes on the issue. Id. at 3. The petition is not supported by any expert opinion regarding the potential significance of IPB to this case.

////

---

[2] California Evidence Code section 1107 provides that in a criminal proceeding, both the defense and the prosecution may introduce expert testimony regarding intimate partner battering and its effects, "including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." Cal. Evid. Code § 1107(a). Prior to amendment in 2004, section 1107 used the term "battered women's syndrome." Decisional law predating the change in nomenclature continues to apply. Cal. Evid. Code § 1107(d).

B. The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland Washington, 466 U.S. 668, 692, 694 (1984). The proper measure of attorney performance is objective reasonableness under prevailing professional norms. Id. at 688. Counsel's strategic choices are entitled to deference to the extent that they are reasonable. Id. at 689-91. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.

Prejudice means that the error actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 693-694. The court need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong. Id. at 697.

C. The State Court's Ruling

This issue was raised both on direct appeal and in petitioner's habeas application to the California Supreme Court. It was the only issue raised in both proceedings.

1. Direct Appeal

The Court of Appeal issued a written opinion affirming the verdict, and the California Supreme Court thereafter denied review without comment. Accordingly, to the extent that disposition on appeal is the state court judgment at issue under 28 U.S.C. § 2254, the opinion of the appellate court is the subject of federal habeas review. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The California Court of Appeal ruled in pertinent part as follows:

> Defendant argues her trial counsel, by failing to present expert evidence of IPB aka BWS under Evidence Code section 1107 […] rendered ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. We conclude she fails to demonstrate ineffective assistance of counsel.

9

The prosecution moved in limine to prohibit the defense from offering any expert testimony about "Battered Women's Syndrome" on the ground that the defense had not disclosed any such expert. Defense counsel confirmed for the court that he had not disclosed any expert witness. The prosecutor requested that the defense also be prohibited from eliciting lay opinion that defendant suffered from "some sort of syndrome." Defense counsel stated: "I'm not going to offer any expert opinions or any lay opinions from anyone, other than my client, that she suffered from any Battered Women's Syndrome, but I think that there could be corroborating witnesses to the incidents against my client, but no, I'm not presenting anything entitled Battered Women's Syndrome, no. These would be percipient witnesses or -- no Battered Women's Syndrome. Of course, if I had an expert witness, I would have given it to them a long time ago, but I'm not choosing to do that as a matter of trial strategy." There was no further ruling.

To demonstrate ineffective assistance of counsel, defendant must show (1) trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced her, i.e., that there is a reasonable probability that defendant would have obtained a more favorable result, but for counsel's failings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696; *People v. Centeno* (2014) 60 Cal.4th 659, 674-675; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

"In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence . . . ." (Evid. Code, § 1107, subd. (a).) This statute is "intended as a rule of evidence only and no substantive change affecting the Penal Code is intended." (*Id.* at subd. (d).) When a defendant claims she killed her abuser in self-defense, the defense has the option to use expert testimony about battering syndrome and its effects on abused persons, to enable the jury to overcome stereotyped impressions about women who remain in abusive relationships. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1086.)

However, although an attorney may present expert testimony to assist the jury, there is no support for the claim that expert testimony must be presented by a defense attorney in every case. (*People v. Datt* (2010) 185 Cal.App.4th 942, 952.)

The decision whether to call a particular witness is a matter of trial tactics and strategy which a reviewing court generally may not second-guess, unless defendant shows an unreasonable failure to investigate. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) Defendant fails to show failure to investigate, and defense counsel's arguments to the jury display his familiarity with the subject.

"When examining an ineffective assistance [of counsel] claim, a reviewing court defers to counsel's reasonable tactical decisions,

10

and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid.*)

Here, defendant relies on the third option, arguing there could be no satisfactory explanation for failing to call an IPB expert to refute the prosecution's claim that defendant committed murder.

However, we can easily conceive of reasonable tactical explanations, and defendant fails to show otherwise. Trial counsel may have concluded that, given the particular facts of this case, a defense expert witness -- upon cross-examination by the prosecution -- could end up hurting rather than helping the defense case as, perhaps, by testifying that defendant did not demonstrate the usual attributes of a battered woman. Such testimony could undermine defense counsel's credibility with the jury. And trial counsel may have determined that an expert was unnecessary in order for counsel to argue to the jury, as he did, the parts of IPB favorable to defendant, e.g., that abused women sometimes stay in abusive relationships, are embarrassed to report the abuse, and continue to love their abusers.

We do not hold that defendant's bullying behavior toward her husband was necessarily inconsistent with battered women's syndrome. We merely observe conceivable reasonable explanations for counsel's performance, i.e., that he concluded an expert would not support and/or the jury would not buy a theory that defendant's bullying behavior and shooting her husband was a result of intimate partner battering by the husband or that defendant shot her husband out of fear.

Courts finding ineffective assistance of counsel in the failure to present a BWS expert had affidavits from trial counsel admitting their mistake. (*People v. Day* (1992) 2 Cal.App.4th 405, 412, 415, 417 [in motion for new trial, trial counsel declared he was unaware of BWS and would have called an expert witness had he known about it]; *Walker, supra*, 147 Cal.App.4th at p. 542 [trial counsel's declaration admitted he should have put on BWS expert evidence but did not because he was preoccupied with his own health issues].)

We conclude defendant fails to show trial counsel rendered ineffective assistance by failing to call an expert witness on IPB and its effects.

ECF No. 10-21 at 7-10.

////

////

2. State Habeas

Petitioner filed a single state habeas petition directly in the California Supreme Court, which was denied without comment or citation. ECF No. 10-23 at 1. The ineffective assistance of counsel claim presented in habeas is substantively identical to the claim that was presented on direct appeal. Compare ECF No. 10-15 (Appellant's Opening Brief) with ECF No. 10-23 at 2-51 (petition for writ of habeas corpus). Although the habeas petition sought an evidentiary hearing on petitioner's claim, it included no proffer of additional facts. To the contrary, its statement of facts is entirely record-based. Because the petition did not allege an expanded factual basis for the claim, it appears to the undersigned that the claim before this court was exhausted on direct appeal and that the appellate resolution of the claim is the proper subject of federal habeas review. The independent reasonableness of the summary denial of the habeas claim is nonetheless addressed below.

D. Objective Reasonableness Under § 2254(d)

1. The Decision of the California Court of Appeal was Not Unreasonable

The state appellate court based its decision on the performance prong of Strickland, concluding that petitioner failed to establish that counsel's decision not to retain an IPB expert was unreasonable. As the appellate court pointed out, it is clear from the record that counsel was aware of the syndrome and its potential defense uses, and that he made a deliberate decision not to pursue expert opinion evidence. Petitioner emphasizes that counsel failed to even consult an expert before making the decision not to utilize expert opinion evidence. Strategic decisions, such as the decision whether or not to rely on expert testimony, are reasonable only to the extent that the underlying investigation is reasonable. See Strickland, 466 U.S. at 690-91. Still, while it may be unreasonable in certain cases for counsel to reject the use of expert witness testimony without first exploring whether a favorable opinion is available, it was not unreasonable of the state appellate court to conclude that this was not such a case—particularly in light of the deference to counsel's decision-making that Strickland requires.

In Harrington v. Richter, the U.S. Supreme Court reversed the Ninth Circuit's conclusion that defense counsel in a murder case had been ineffective in failing to consult an expert

regarding blood evidence found at the scene.[3] The Supreme Court rejected the notion that a strategic decision not to call a particular type of expert witness is unreasonable absent prior consultation or other preliminary investigation in order to assess the pros and cons of using such evidence at trial.

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." [Citations omitted.] Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. . . .
>
> From the perspective of [trial counsel], there were any number of hypothetical experts—specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly have been useful. An attorney can avoid activities that appear "distractive from more important duties." [Citation omitted.] Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. [Citations omitted.]

Richter, 562 U.S. at 107. The Court went on to emphasize that habeas relief is unavailable where reasonable defense counsel "might" elect not to use expert testimony, regardless of counsel's actual reasoning process or lack thereof. Id. at 108, 109.

In this case, it is perfectly clear that defense counsel made a deliberate decision to rely on percipient witness testimony about the domestic violence petitioner had experienced, and to argue from that evidence that she was "an abused person, [who shot] the abuser in self-defense, in the heat of passion." 1 RT 29 (ECF No. 10-7 at 43) (counsel's explanation that he was relying on percipient witness testimony and would not present evidence of any "syndrome"); 6 RT 1625 (ECF No. 10-12 at 218) (defense closing argument).[4] Counsel described his decision to rely on lay testimony and a theory about abuse, rather than relying on expert testimony about a syndrome,

---

[3] In post-conviction proceedings, the petitioner in Richter had submitted the affidavits of four different experts who provided information and opinions regarding the blood evidence that would have had defense value at trial. In the instant case, petitioner has provided no evidence showing that a favorable expert opinion was available.

[4] The entire closing argument elaborated on this theme.

13

1  as a strategic choice, 1 RT 30 (ECF No. 10-7 at 44), though his reasons for this choice were never
2  stated on the record.  The court of appeal found that "[t]rial counsel may have concluded that,
3  given the particular facts of this case, a defense expert witness—upon cross-examination by the
4  prosecution—could end up hurting rather than helping the defense case as, perhaps, by testifying
5  that defendant did not demonstrate the usual attributes of a battered woman." ECF No. 10-21 at
6  9.  Though speculative, this reasoning is not inconsistent with clearly established federal law as
7  articulated in Richter.  Alternatively, counsel might have believed as a general matter that juries
8  do not respond favorably to expert testimony regarding mental state.  Or counsel may simply
9  have wished to avoid the case becoming a battle of experts, a potential justification that supports
10  deference to counsel's decision.  See Richter, 562 at 108-109.

11       In any event, it is not for this court to independently evaluate the reasonableness of
12  counsel's performance.  As the Supreme Court emphasized in Strickland itself, a reviewing court
13  "must indulge a strong presumption that counsel's conduct falls within the wide range of
14  reasonable professional assistance; that is, the defendant must overcome the presumption that,
15  under the circumstances, the challenged action 'might be considered sound trial strategy.'"
16  Strickland, 466 U.S. at 694-95 (citation omitted).  The appellate court applied the required
17  presumption, and its finding that petitioner had not overcome the presumption cannot fairly be
18  characterized as objectively unreasonable.

19       Review of a Strickland claim under the AEDPA requires a double dose of deference.
20  Richter, 562 U.S. at 105.  "When § 2254(d) applies, the question is not whether counsel's actions
21  were reasonable.  The question is whether there is any reasonable argument that counsel satisfied
22  Strickland's deferential standard."  Id.  Applying this doubly deferential standard, it was not
23  objectively unreasonable for the state court to conclude that counsel's performance fell within the
24  "wide range of reasonable performance" that Strickland contemplates, and that the challenged
25  action "might be considered sound trial strategy."  See Strickland, 466 at 694-95.  Relief is
26  therefore unavailable.
27  ////
28  ////

2. <u>The Summary Denial of the State Habeas Petition was Not Unreasonable</u>

Under California law, summary denial of a habeas petition constitutes a judgment that the petitioner has not stated a prima facie claim for relief. <u>In re Clark</u>, 5 Cal. 4th 750, 770 (1993). When a state court denies a claim for failing to state a prima facie case, the absence of a prima facie case is the determination that must be reviewed for reasonableness under § 2254(d). <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054-55 (2003), <u>cert. denied</u>, 543 U.S. 1038 (2004). Accordingly, if the California Supreme Court's denial of petitioner's habeas petition is the judgment subject to review under § 2254, the question for this court is whether it was reasonable to reject the claim for absence of a prima facie case.

Because an ineffective assistance claim requires facts sufficient to demonstrate both counsel's deficient performance and prejudice from the errors, the absence of any facts establishing prejudice necessarily means that the claim fails. See <u>Strickland</u>, 466 U.S. at 697. The petition presented to the California Supreme Court, ECF No, 10-23 at 2-50, is devoid of facts showing what specific exculpatory evidence related to IPB could have been developed and presented in petitioner's case had counsel retained an expert.[5] Absent such facts, petitioner cannot establish that she would have likely obtained a trial outcome more favorable than second degree murder had counsel conducted the investigation she urges. Her conclusory allegations of prejudice are insufficient to state a claim. See <u>Wildman v. Johnson</u>, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer evidence that expert would have testified); <u>Grisby v. Blodgett</u>, 130 F.3d 365, 373 (9th Cir. 1997) (speculation about unpresented evidence, including expert testimony, is not enough to establish prejudice from ineffective assistance); <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1042

---

[5] Instead, petitioner relies on the general relevance of Intimate Partner Battering Syndrome to cases involving intimate partner violence, and cites a discussion of expert testimony in a 1996 California Supreme Court case. ECF No. 10-23 at 38; <u>see also</u> <u>id.</u> at 39-42 (arguing uses of IPB evidence in homicide cases generally). These assertions of general topical relevance do not establish a prima facie case of prejudice. There is no reason to think, let alone a reasonable probability to believe, that petitioner's jury would have reached a different decision had they merely been informed that experts exist who believe that IPB Syndrome exists and can in some cases help to explain otherwise counter-intuitive behavior by victims of domestic violence.

15

(1995) (absent a specific account of what beneficial evidence would have been revealed by further investigation, petitioner cannot meet the prejudice prong of Strickland). Because petitioner failed to adequately plead prejudice, summary denial of her claim was not objectively unreasonable.

Accordingly, if the denial of state habeas relief is the judgment subject to review in this court, federal habeas relief is unavailable.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 4, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE